# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

CALVIN K. WILLIAMS (#333771)                    CIVIL ACTION NO.

VERSUS                                          CASE NO. 21-640-SDD-SDJ

TIM HOOPER

## NOTICE

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the U. S. District Court.

In accordance with 28 U.S.C. § 636(b)(1), you have 14 days after being served with the attached report to file written objections to the proposed findings of fact, conclusions of law, and recommendations set forth therein. Failure to file written objections to the proposed findings, conclusions, and recommendations within 14 days after being served will bar you, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.

ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.

Signed in Baton Rouge, Louisiana, on September 30, 2024.

_____

**SCOTT D. JOHNSON**
**UNITED STATES MAGISTRATE JUDGE**

# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**CALVIN K. WILLIAMS (#333771)**          **CIVIL ACTION NO.**

**VERSUS**                               **CASE NO. 21-640-SDD-SDJ**

**TIM HOOPER**

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Before this Court is a Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody, filed by Calvin K. Williams, who is proceeding *pro se* and is confined at the Louisiana State Penitentiary.[1] Petitioner argues the following grounds for relief: (1) He was denied the right to confrontation when statements made by a non-testifying co-defendant were allowed over objection; (2) The evidence was insufficient in that no evidence was entered as to any statement or act by him from which the jury could infer specific intent; and (3) He had ineffective assistance of counsel because (a) counsel failed to raise the appropriate objection, thereby denying Petitioner's right to be confronted with the witnesses against him, and (b) counsel failed to seek an instruction that the "mere presence at the scene of a crime did not permit an inference of guilt."[2] It is recommended that the Petition be denied. There is no need for oral argument or for an evidentiary hearing.

## I.    PROCEDURAL HISTORY

On May 15, 2013, Petitioner and codefendants Cecil Ray Beals and Darryl Jones were indicted for second-degree murder in violation of La. R.S. 14.30.1.[3] Petitioner plead not guilty,[4] and, following a jury trial before the Twenty-Third Judicial District Court, Petitioner was found

---

[1] R. Doc. 1.
[2] R. Doc. 1, pp. 1-6.
[3] R. Doc. 5-1, p. 150. Jones and Beals were indicted in the same bill of indictment as Petitioner.
[4] R. Doc. 5-7, p. 222.

1

guilty of second-degree murder.[5] On July 14, 2014, Petitioner was sentenced to life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence.[6] Petitioner appealed his conviction to the Louisiana First Circuit Court of Appeal, which affirmed his conviction and sentence on July 7, 2016.[7] Petitioner then filed an application for supervisory writs with the Louisiana Supreme Court, which was denied on May 19, 2017.[8]

On June 29, 2018, Petitioner filed an application for post-conviction relief in the 23rd JDC, wherein he asserted his counsel was ineffective because he failed to raise an issue regarding his right to confront witnesses against him, in violation of the Sixth Amendment of the United States Constitution.[9] Judge Jason Verdigets denied Petitioner's PCR application on April 5, 2019.[10] On April 26, 2019, Petitioner filed a notice of intent to apply for writs.[11] In June 2019, Petitioner filed a motion to supplement his writ application, urging that Judge Verdigets had performed prosecutorial duties relative to his conviction and that he had erred in failing to recuse himself.[12] On October 24, 2019, the First Circuit stayed the writ application in part and granted it in part for the sole purpose of transferring the writ application to the district court for a ruling on Petitioner's motion to recuse.[13] Review of the district court's ruling denying the application for postconviction relief was stayed pending a ruling on the motion to recuse.[14] On November 6, 2019, Judge

---

[5] R. Doc. 5-2, p. 16, R. Doc. 5-7, p. 181.

[6] R. Doc. 5-7, pp. 195 and 200.

[7] R. Doc. 5-7, p. 227; *State v. Williams*, 2015-0509, 2016 WL 3655434 (La. App. 1st Cir. 7/7/2016)(unpublished).

[8] R. Doc. 5-8, p. 2; *State v. Williams,* 2016-1373 (La. 5/19/2017), 219 So.3d 336 (Mem).

[9] R. Doc. 5-8, pp. 3-8. Therein, Petitioner stated, "Art. 1, § 13 La. Const. right to effective assistance of counsel; 6th Amend. U.S Const. - right to confront witness against him. Please see Attachment #1." He also stated, "Trial Counsel failed to raise issue/objection during trial." R. Doc. 5-8, p. 7. Also see Attachment 1, Post-Conviction Relief Application, R. Doc. 5-8, pp. 9-22. Petitioner signed the application on this date. A document is considered "filed" when a *pro se* prisoner delivers it to the prison authorities for forwarding to the court clerk. *Houston v. Lack*, 487 U.S. 266, 276 (1988).

[10] R. Doc. 5-8, p. 43.

[11] R. Doc. 5-8, p. 45.

[12] R. Doc. 5-8, p. 55-58.

[13] R. Doc. 5-8, p. 60; *State v. Williams*, 2019-0716, 2019 WL 5457919 (La. App. 1st Cir. 10/24/2019)(unpublished).

[14] *Id*.

Verdigets ordered that the clerk of court randomly allot this case for hearing on the motion to recuse.[15] By order dated December 10, 2019, Judge Verdigets was recused, and the matter was randomly reallotted.[16] Petitioner filed a motion to amend and supplement his application for post-conviction relief on September 2020.[17] By judgment dated December 28, 2020, the district court denied defendant's application for post-conviction relief and his amended and supplemental application.[18] Petitioner filed a notice of intent, seeking review of that judgment[19] and the First Circuit denied Petitioner's writ application on March 15, 2021.[20] Petitioner's writ application to the Louisiana Supreme Court was likewise denied.[21] On November 2, 2021, Williams timely filed his habeas petition with this Court.

## II.    FACTUAL BACKGROUND

The pertinent facts, as accurately summarized by the First Circuit, are as follows:[22]

> On Saturday, January 12, 2013, between 3:30 and 4:00 a.m., Marvin Joe Mayers, who lived on Panama Road in Sorrento, Louisiana, was walking his dog when he heard gunshots and then saw a silver or gray vehicle, with a spoiler on the back and a stripe down the side, speed down the road…. Subsequently, Shawn Dunbar, a driver in the area travelling from Panama Road to LV Road discovered a body, later identified as victim Gerald G. Wilkins, on the side of the road in a wooded area. Mr. Dunbar immediately reported his discovery to a 911 dispatcher and a nearby resident. At approximately 8:00 a.m., officers of the Ascension Parish Sheriff's Office (APSO) were dispatched to the wooded area on LV Road. Deputy Chris Williams … secured the scene, called the APSO criminal investigation division (CID), and took statements from Mr. Dunbar and other potential witnesses….

> … Lieutenant Gerald Whealton, an APSO crime scene investigator, noted that the victim's hands were not scuffed or injured, his shirt was not torn or dirty,

---

[15] R. Doc. 5-8, p. 62.
[16] R. Doc. 5-8, p. 76.
[17] R. Doc. 5-8, pp. 160-179.
[18] R. Doc. 5-8, p. 156. Reasons for judgment were also issued on that date. R. Doc. 5-8, pp. 152-154. An April 27, 2020 judgment dismissing Petitioner's application for post-conviction relief was rescinded on June 11, 2020. *See* Doc. 5-8, pp. 100 and 133.
[19]. Doc. 5-8, p. 181.
[20] *State v. Williams*, 2021-0107, 2021 WL 961671 (La. App. 1st Cir. 3/15/2021)(unpublished); R. Doc. 5-8, p. 186.
[21] R. Doc. 5-8, p. 191; *State v. Williams,* 2021-00551 (La. 9/27/2021), 324 So.3d 81 (Mem).
[22] *State v. Williams*, 2015-0509 at pp. 1-2.

nor were his clothes disheveled; thus, Lt. Whealton concluded that the victim had not been involved in a struggle. Lt. Whealton further noted that, while the ground was wet from recent rainstorms, and filthy with dirt and debris that was blown around the area, the victim's shoes were relatively dirt and debris free, indicating that he did not walk to the location where he was found. When the victim's body was turned over, … the victim's pants' zipper was down, his genitals were exposed, and the front of his pants were wet, indicating that he was urinating at the time of his murder. …

… Ty Gautreau of the Ascension Parish Coroner's Office pronounced the victim dead when he arrived at the scene. The victim's death certificate was later issued, indicating that the cause of death was gunshot wounds to the head.

During their investigation, the police identified three individuals, defendant Williams, Mr. Beals, and Mr. Jones, who became suspects in the victim's murder. The victim, defendant Williams, Mr. Jones, and Mr. Beals, who lived in Mr. Jones' garage, regularly met up at Mr. Jones' house, and they were all there the day and evening before the murder. Marvin McGee, an associate of the codefendants who was also at Mr. Jones' house that day, and who spent the night there, testified that between 10:30 and 11:00 p.m., he noticed that Mr. Jones' vehicle was gone. Mr. McGee also testified that he loaned defendant Williams one of the two cell phones that he had that night and that Mr. Jones' vehicle was gone at some point after he gave defendant Williams the phone.

Mr. Jones' vehicle, a silver 2000 Chevrolet Impala, matched the description provided by Mr. Mayers, the Sorrento resident who heard the gunshots and saw a vehicle speeding down Panama Road. Records for the cell phone that defendant Williams had that night showed that the cell phone was initially used in Baton Rouge, was used in Sorrento around the time of the murder, and was then taken back to Baton Rouge. In addition to these records, surveillance video from a convenience store located 1.4 miles from the murder scene showed that, at 3:38 a.m., Mr. Beals exited Mr. Jones' vehicle and entered the store, and an unidentified driver pulled the car around. There appeared to be a passenger in the back seat of the vehicle.

State witness Jeremiah Billingsley knew Mr. Beals and Mr. Jones and testified that, while he and Mr. Beals were incarcerated together, Mr. Beals disclosed the facts surrounding the murder. Specifically, Mr. Beals told Mr. Billingsley that, before the murder, the victim had stolen from Mr. Jones multiple times. Mr. Beals offered to "take care" of the victim when he first began stealing from Mr. Jones, but Mr. Jones made it clear that the victim was not to be touched. Mr. Billingsley further testified that Mr. Beals told him that, as the victim continued to steal from Mr. Jones, "they" took the victim to Sorrento, and when the victim got out of the car to urinate, "that's when he was taken care of."

### III.    LAW & ANALYSIS

#### A.    Applicable Legal Standards

Under 28 U.S.C. § 2254(d), an application for a writ of habeas corpus shall not be granted with respect to any claim that a state court has adjudicated on the merits unless the adjudication has "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Relief is authorized if a state court arrived at a conclusion contrary to that reached by the Supreme Court on a question of law or if the state court decided a case differently than the Supreme Court on materially indistinguishable facts.[23]

Relief is also available if the state court has identified the correct legal principle but has unreasonably applied that principle to the facts of the petitioner's case or has reached a decision based on an unreasonable factual determination.[24] Mere error by the state court or this Court's mere disagreement with the state court determination is not enough; the standard is one of objective reasonableness.[25] State court determinations of underlying factual issues are presumed to be correct, and the petitioner has the burden to rebut that presumption with clear and convincing evidence.[26] The last reasoned state court opinion regarding Petitioner's first and second claims (right to confrontation and sufficiency) are the First Circuit's decision on direct appeal. As such it is the relevant reasoned opinion for AEDPA deference.[27] The last reasoned state court opinion

---

[23] *Williams v. Taylor*, 529 U.S. 362, 413, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000).
[24] *See Montoya v. Johnson*, 226 F.3d 399, 404 (5th Cir. 2000).
[25] *Id; see also Williams*, 529 U.S. at 409 ("[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable").
[26] 28 U.S.C. § 2254(e)(1).
[27] *Wilson v. Sellers*, 584 U.S. 122, 125, 138 S. Ct. 1188, 1192, 200 L.Ed.2d 530 (2018) ("when the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion…a federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable.").

regarding Petitioner's third claim (ineffective assistance of counsel) is the decision from the state supreme court on Petitioner's PCR application. Thus, that September 27, 2021 decision is the relevant reasoned opinion for AEDPA deference.[28]

### B.        Sufficiency of the Evidence (Ground Two)

In this assignment of error, Petitioner contends no evidence was entered at trial as to any statement or act by him from which the jury could infer specific intent to support his conviction.[29] Petitioner argues there was no evidence that he was in possession of Mr. McGee's phone, which called the victim in the early morning hours of January 12, 2013, or that he was in Sorrento when Wilkins was murdered.[30] In its Answer, the State urges that Petitioner's insufficiency claim is "constitutionally, statutorily, and jurisprudentially infirm in that the evidence adduced at trial amply supports Petitioner's conviction beyond any reasonable doubt and excludes any other reasonable hypothesis of innocence."[31] Further, in the State's Memorandum in Support of Answer, it references the First Circuit's summary of the evidence on direct appeal, urging that "[e]ven where an offender is merely a principal," the offender can be found guilty of the offense charged.[32] In Petitioner's Reply to the State's Answer, he posits the guilty verdict in this case was based on speculation and guilt by association.[33] He urges, "No evidence was introduced from which the jury could reasonably infer that [he] was a principal to the homicide of Mr. Wilkins."[34]

---

[28] *Id*. In its Answer, the State did not argue that Petitioner had failed to exhaust any of his arguments in the state court proceedings. R. Doc. 8, pp. 1-2.

[29] R. Doc. 1, pp. 4-5.

[30] Petitioner's Memorandum of Law in Support of Petition for Federal Habeas Corpus, R. Doc. 5-1, p. 31.

[31] R. Doc. 8, p. 2.

[32] R. Doc. 9, p. 13. La. R.S. 14:24 provides, "All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals."

[33] R. Doc. 11, p. 5.

[34] *Id*.

The applicable legal standard requires that this Court consider whether the evidence was sufficient to prove second-degree murder, which was the verdict in his case.[35] A conviction based on insufficient evidence cannot stand as it violates due process.[36] In a federal habeas corpus proceeding, the Supreme Court's decision in *Jackson v. Virginia*[37] provides the standard for testing the sufficiency of the evidence. The question "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[38] Further, the federal habeas court's consideration of the sufficiency of the evidence is limited to a review of the record evidence offered at the petitioner's state court trial.[39]

State law defines the substantive elements of the offense, and a state judicial determination that the evidence was sufficient to establish the elements of the offense is entitled to great weight on federal habeas review.[40] The First Circuit accurately described the standard of *Jackson* noted above[41] and undertook a detailed analysis of the claim, as follows, in pertinent part[42]:

> The crime of second-degree murder, in pertinent part, is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. LSA–R.S. 14:30.1(A)(1). Specific criminal intent is that state of mind that exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. LSA–R.S. 14:10(1). Though intent is a question of fact, it need not be proven as a fact. It may be inferred from the circumstances of the transaction. Specific intent may be proven by direct evidence, such as statements by a defendant, or by inference from circumstantial evidence, such as a defendant's actions or facts depicting the circumstances. Specific intent is an ultimate legal conclusion to be resolved by the fact finder.... [U]nder LSA–R.S. 14:24, all persons concerned in the commission of

---

[35] *Hebert v. Vannoy*, No. 20-616, 2023 WL 6396078, at *4 (M.D. La. Sept. 14, 2023), *report and recommendation adopted*, No. 20-616, 2023 WL 6396588 (M.D. La. Sept. 29, 2023).

[36] *See* U.S. Const. amend. XIV.

[37] 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

[38] *Id.* at 319 (emphasis in original).

[39] *Ramirez v. Dretke*, 398 F.3d 691, 694 (5th Cir. 2005); *Knox v. Butler*, 884 F.2d 849, 852 n.7 (5th Cir. 1989).

[40] *Hawkins v. Lynaugh*, 844 F.2d 1132, 1134 (5th Cir. 1988).

[41] *State v. Williams*, 2015-0509 at p. 3.

[42] *Id.*, 2015-0509 at pp. 3-10.

a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.

Dr. Christopher Tape, an expert in forensic pathology, performed the victim's autopsy. Dr. Tape testified that the victim's cause of death was three gunshot wounds to the head…. Dr. Tape testified that [two of the three] gunshot wounds were inflicted at a close proximity and had stippling, which is gun powder residue from the barrel of a gun. The fatal gunshot wound, the one that entered the back of the victim's head and fractured his skull with no exit, did not have any stippling, indicating that it was not shot within close proximity like the other two gunshots.

Mr. Mayers, the State witness who lived …  near the crime scene, testified that he was walking his dog between 3:30 and 4:00 a.m. on January 12, 2013, when he heard three steady gunshots coming from down the road. Mr. Mayers, a former sergeant in the Marine Corps, ascertained that the gunshots were fired from a large caliber weapon. Immediately after the gunfire, he heard a motor "crank up" and observed a silver or gray vehicle with a spoiler on the back and a stripe down the side, speeding down the road, passing him with its lights off.…After being shown a photograph of Mr. Jones' vehicle, Mr. Mayers confirmed that it resembled the vehicle he saw that morning….

Mr. McGee, also a State witness, testified that he knew the codefendants, as they all lived in the same Baton Rouge neighborhood, Mayfair, located between Staring Lane and Bluebonnet Boulevard, and Perkins Road and Highland Road. Mr. McGee visited Mr. Jones daily. He used nicknames for Mr. Jones ("Hooper") and defendant Williams ("Dirt"), while referring to Mr. Beals by his first name, Cecil. On Friday, January 11, 2013, Mr. McGee was at Mr. Jones' house all day doing some indoor painting and spent the night there. Mr. McGee testified that Mr. Jones hired him to paint the inside of the house and that he was being paid with cash and drugs. He noted that many different people came to the house throughout the day, including Mr. Beals, defendant Williams, Mr. Jones' girlfriend, Mr. Jones' mother, and the victim, whom Mr. McGee referred to as "Budda." He testified that the victim was only there during the day and left before dark. When asked what the visitors did, Mr. McGee stated, "Just coming through, partying or drinking, smoking, whatever, just stopping to visit or whatever." When asked what they were smoking, he specified that it was "[w]eed, dope, cigarettes, smoke."

Mr. McGee had two cell phones with him at Mr. Jones' house that day. Defendant Williams asked to borrow one of the cell phones late in the evening. Mr. McGee noted that he gave defendant Williams the one with a phone number that began with the first three digits of "274." About an hour later, Mr. McGee went into the garage where defendant Williams and Mr. Beals had been, but neither of the men were present, and Mr. Jones' vehicle was gone. Mr. McGee further testified that Mr. Jones did not leave the house that night.

Mr. McGee saw defendant Williams and Mr. Beals again on the morning of Saturday, January 12, 2013, before daylight. At that time, estimated at about 4:00 a.m., Mr. McGee found his borrowed cell phone in the garage and Mr. Beals was back in the garage. Mr. McGee testified that he later gave the cell phone away. Mr. McGee learned about the victim's death later that day. After they were all questioned by the police, Mr. Jones asked Mr. McGee to retrieve the phone, bring it to him, and not give it to the police. Mr. McGee told Mr. Jones that he gave the phone to someone he called "Skinny," whom he also identified as "Lacey."

On cross examination, Mr. McGee confirmed that the victim often came to Mr. Jones' house and that Mr. Beals lived in Mr. Jones' garage. Mr. McGee testified that he did not know when Mr. Jones retired for the night and noted that when he tried to wake Mr. Jones the next morning, he did not get a response to his knock or his phone call, and assumed Mr. Jones was sleeping. He confirmed that he was at the house and remained awake all night and that he did not see Mr. Jones leave. Mr. McGee estimated that it was between 10:30 and 11:00 p.m. when he first noticed that Mr. Jones' vehicle was gone, but Mr. McGee did not see the vehicle as it was driven off and did not know who left in the vehicle.

Mr. McGee confirmed that he was using drugs, including crack cocaine, at the time, and when asked if he had problems recalling the events, he noted that the incident occurred over a year before the trial. He recalled seeing the victim leave Mr. Jones' house on foot. Despite his initial testimony, after reviewing his police statement, Mr. McGee confirmed that the victim could still have been at Mr. Jones' house as late as 9:00 p.m., after dark, but confirmed that after the victim left, he noticed that Mr. Beals was gone.…Mr. McGee further confirmed that the victim used counterfeit money to purchase drugs in the past…. While confirming that many people did not like the victim, he stated that he did not know of any issues between the victim and defendant Williams. When further questioned about his drug use and ability to recall things that occurred while he was under the influence, Mr. McGee testified, "Actually, I have a pretty clear recollection under the influence of crack, not weed but crack." He further testified that he used both drugs around the time of the murder and characterized his crack cocaine use as an "everyday thing."

On redirect examination, Mr. McGee was asked to clarify his earlier testimony as to whether Mr. Jones was in the car that night. Mr. McGee responded, "I think I said he couldn't have came past me 'cause I was in the kitchen and he would have come through the hallway to get to the car." Mr. McGee acknowledged that he was not in the kitchen the whole time, specifically confirming that he was in the garage and on the back patio at times, and that he would not have seen Mr. Jones if he departed during those times and could not confirm for a fact that Mr. Jones did not leave that night.

Detective Latonya Sullivan of the APSO CID was dispatched to the scene on LV Road and interviewed Mr. Dunbar and Mr. Mayers. After the victim was identified, Detective Sullivan contacted the victim's mother, Cheryl Wilkins, who provided the victim's cell phone number. Detective Sullivan learned that the victim frequented Mr. Jones' house and hung out with defendant Williams and Mr. Jones. APSO Detective Sergeant Mike Bruner collected video footage from several gas stations and restaurants along Highway 22 in Sorrento, near the area of the crime scene. Detective Bruner noted that, coming from Baton Rouge, he would take the I–10 towards New Orleans, exit at Highway 22, and then travel straight down to LV Road to arrive where the victim's body was located. The police identified Mr. Beals and Mr. Jones' vehicle from the January 12, 2013 surveillance video at Speedy Junction on Highway 22 at I–10, just 1.4 miles from the crime scene. The vehicle shown in the video was consistent with the class and characteristics of a 2000 Chevrolet Impala and had a spoiler in the back and a black stripe down the side. As Detective Bruner noted, at 3:38 a.m., Mr. Beals walked into the Speedy Junction, stayed in the store for approximately twenty to thirty seconds, and then returned to Mr. Jones' vehicle. Detective Bruner further noted that, as Mr. Beals was walking around the gas pumps, the vehicle was pulling around, obviously occupied by a driver; the front passenger seat was empty; and, an "outline" of what appeared to be an occupant was visible in the back seat. When asked if the "outline" could have been something other than a person (such as a bag, hanging clothing, or a car seat), Detective Bruner agreed that it could, but stated that, in his opinion, the outline was of a person.

On January 15, 2013, Mr. Jones met with the police at the East Baton Rouge Violent Crimes Unit and was interviewed. Mr. Jones drove the Impala to the sheriff's office, confirmed that it was his vehicle, and provided his cell phone and home phone numbers. Mr. Jones stated that the victim was at his house the night of January 11, 2013, at 9:00 p.m., that the victim left between 10:00 and 11:00 p.m., and that he never saw the victim again. Mr. Jones also stated that Mr. Beals lived in his garage and often borrowed his vehicle. He confirmed that defendant Williams and Mr. Beals were at his house that night, as was as his girlfriend, Nicole Billingsley, who lived with him. According to Detective Sullivan, Mr. Jones denied having any issues with the victim and specifically stated, "I did not kill Budda, I did not send Budda with anyone to get killed." In a subsequent interview with APSO officers, defendant Jones confirmed that the victim was "somewhat of a troublemaker," and that "amongst his friends, he [Jones] gave instructions that [the victim] was not to be touched." He also indicated that he went to bed at approximately 2:00 a.m. on the morning of the murder.

On January 16, 2013, Detective Sullivan interviewed Ms. Billingsley, Mr. Beals, and Mr. McGee. Ms. Billingsley indicated that Mr. Beals often drove Mr. Jones' vehicle. Ms. Billingsley further stated that defendant Williams, Mr. Beals, and Mr. McGee were at Mr. Jones' house the day and night before the murder.

In his interview, Mr. Beals stated that he had family in Sorrento but he had not been there since childhood. He confirmed that he often drove Mr. Jones' vehicle to make "runs" and to pick up packages and that he drove it on the night in question but did not leave Baton Rouge. Mr. Beals described the victim as a "screw up." When asked if he killed the victim, Mr. Beals stated, "If I would have killed Budda[,] I would have shot him in broad daylight from a distance. I would have not walked up on him from the back and shot him." Notably, at the time Mr. Beals made this statement, details concerning how the victim had been shot had not been made public. During cross examination, Detective Sullivan confirmed that the victim had several enemies. She further confirmed that fingerprints and DNA were collected from Mr. Jones' vehicle and acknowledged that the only prints identified belonged to Ms. Billingsley. Detective Sullivan indicated that the vehicle was noted as having been cleaned out and washed.

Detective Sergeant David Baldwin, an APSO investigator, also took part in the police interviews. Detective Baldwin noted that, while Mr. Beals denied being in Sorrento, after he showed him still shots from the Speedy Junction surveillance video footage, including a close up of himself near the entrance of the store, Mr. Beals confirmed that it was him in the photograph. Mr. Beals further acknowledged that Mr. Jones' vehicle was shown in another still photograph from the surveillance footage. Mr. Beals, however, still denied being in Sorrento.

Detective Bruner and Detective Sullivan testified regarding the records for the victim's cell phone, other cell phones identified by the investigators as relevant to the case, and the "SIM-con" report from the phone identified as belonging to Mr. Jones. The phone records for Shawn Aikens, defendant Williams' half-brother, were also among the records obtained. Mr. McGee's cell phone, the one he loaned to defendant Williams the night before the murder, was in the victim's call detail records. For the time period of January 11, 2013, at 5:57 p.m., to January 13, 2013, at 11:21 p.m., in addition to call logs, Detective Bruner obtained text message logs and cellular data logs. The call detail records for Mr. Jones' phone were for a similar time range.

On January 11, 2013, at 10:41 p.m., the victim's cell phone was used to call Mr. Jones' cell phone utilizing towers in the Mayfair area where Mr. Jones' house is located in Baton Rouge. At 1:00 a.m. on January 12, 2013, Mr. McGee's cell phone, in the Mayfair area, was used to call Mr. Jones' cell phone, which was in South Baton Rouge at that time. Mr. McGee's phone, still in the Mayfair area, was then used to call the victim's cell phone, which was in the Industriplex Park area of Baton Rouge. Specifically, at 1:15 and 1:36 a.m., Mr. McGee's cell phone was used to call the victim's cell phone. At 3:16 a.m., Mr. McGee's cell phone was used to call Shawn Aikens' residence on Panama Road in Sorrento. Again, at 3:17, 3:18, and 3:21 a.m., Mr. McGee's cell phone showed calls to Mr. Aikens' residence. Using the tower near the murder scene, Mr. McGee's cell phone was used to call Mr. Jones' cell phone several times between 4:00 and 4:23 a.m., the latter which was in the Mayfair area of Baton Rouge. At 4:24 a.m., Mr. McGee's cell phone

had moved from Highway 22 and I–10, north towards Baton Rouge, when it was again used to call Mr. Jones' cell phone, which was in Baton Rouge. At 5:16 a.m., the victim's cell phone was back in the Mayfair area, as determined through triangulation data. By 6:14 a.m., when Mr. McGee's cell phone was used to call Mr. Jones' cell phone, both phones were in the Baton Rouge/Mayfair area. Thus, the records show that Mr. McGee's cell phone started in Baton Rouge and then travelled to Sorrento around the time of the murder, and back to Baton Rouge, but there was no indication that Mr. Jones' cell phone ever left Baton Rouge. Detective Bruner noted that Mr. Beals' phone records were sparse during the relevant time period and there was a lapse in the data, meaning no calls were being placed or received during the relevant time.

As noted by Detective Sullivan, although Mr. Jones' cell phone remained in Baton Rouge, his phone records show that, in addition to incoming calls from Mr. McGee's cell phone, Mr. Jones had several missed calls from his home number to his cell number, and that outgoing calls were made, and a text message was sent, from his cell phone during the time frame that he claimed to be at home and asleep. Detective Bruner also testified regarding the connection and duration of the phone calls and noted that, while some of the calls to Mr. Jones' cell phone were unanswered and thus had a zero-second elapsed timeframe, others, based on the duration, appeared to have been unanswered, or consisted of messages left on a voicemail.

Ms. Billingsley, Mr. Jones' girlfriend, also testified at the trial. Ms. Billingsley began living with Mr. Jones after she separated from her ex-husband, Jeremiah Billingsley, and she lived with Mr. Jones for approximately three years. She testified that Mr. Beals lived in the garage at Mr. Jones' house, that she knew defendant Williams and Mr. Beals well, and that she also knew the victim, though she was less familiar with him. When asked if the victim ever spent the night at Mr. Jones' house, she stated, "He would really stay all night and was smoking, you know, 'cause we'd all be up drinking and smoking." She confirmed that she was living with Mr. Jones at the time of the murder and that many people were in and out of Mr. Jones' house on the day and night in question. She stated that Mr. Beals and Mr. Jones were there but did not recall seeing defendant Williams or Mr. McGee. Ms. Billingsley confirmed that she had difficulty remembering the night leading up to the murder and that she was constantly drinking and using drugs at the time. She also confirmed that she was reluctant or upset about being interviewed by the police and that she told Mr. Beals that he should be the one to be interviewed, because he did not like the victim and previously stated one month before the murder that he would "chop off his head with a machete." She later added that Mr. Beals "talks a lot" when asked if she took his statement seriously. Regarding the victim, she added, "But everybody didn't like him ... he was always loud[ ] and ... rude to everyone." She stated, however, that Mr. Jones seemed to like the victim and did not have any problems with him. When asked if Mr. Jones left that night, she stated, "Not that I know of." She added that she and Mr. Jones were in bed together all night. She denied using Mr. Jones' phone that night, and

12

when asked if the phone was ringing that night, she stated that "it was always ringing a lot."

Ms. Billingsley confirmed that her ex-husband, Mr. Billingsley, had in the past falsely accused Mr. Jones of threatening to kill him. When further asked about Mr. Billingsley's tendency to lie, she stated, "He got into an accident and half the skull was taken off so he kind of, you know, he's not right a little bit." She described Mr. Billingsley as a "pathological liar" who believes his own lies.

Mr. Billingsley, Ms. Billingsley's ex-husband referenced above, also testified. Mr. Billingsley knew Mr. Beals and Mr. Jones but was not familiar with defendant Williams. Mr. Billingsley confirmed that he suffered brain damage and neurological problems after a work-related accident and had to relearn how to walk and speak after being in a coma for several months. He also confirmed that he had a drug problem in the past. He testified that he had his drug problem under control at the time of the trial and that his mental health was "fine." Mr. Billingsley was incarcerated with Mr. Beals in Ascension Parish after the murder. He testified that he had a conversation with Mr. Beals in which Mr. Beals told him that he was in jail for murder and that "they" were having problems with a guy (the victim) at Mr. Jones' house who was stealing "dope" from Ms. Billingsley, stealing from Mr. Jones, and being a bully. Mr. Beals stated that he wanted to "take care of him" after the initial incidents, but Mr. Jones "said no, don't worry about it." Mr. Beals further told Mr. Billingsley that the victim continued to steal from Mr. Jones. Mr. Billingsley specifically testified, "Well, I think a day or a couple days later the guy stole some more from Hooper [Mr. Jones]. Him and Cecil—well, Cecil, Dirt or Calvin Williams, whatever his name is, and the victim they left the house." Mr. Beals specifically told Mr. Billingsley that "three people left and two people came back." It was three of them that left and two of them came back." When asked what happened afterwards, Mr. Billingsley testified that Mr. Beals said "they" went out to Sorrento. Mr. Billingsley added, "[T]hey went down some road down in Sorrento by a bayou or some—or a boat landing and the guy said he had to use the bathroom to urinate, and when he got out the car that's when he was taken care of." After that, "they" left and went back to Mr. Jones' house in Baton Rouge. Mr. Beals told Mr. Billingsley that the weapon would never be found and that the only evidence the police had against them included pictures from a gas station in Sorrento and cell phone signals in the area. On January 29, 2013, while still incarcerated, Mr. Billingsley reported Mr. Beals' statements to the police. Mr. Billingsley denied that he had seen any news or read any information about the murder.

Mr. Billingsley admitted to previously filing a false police complaint against Mr. Jones alleging that Mr. Jones tried to kill him. He stated that his trial testimony in this case was truthful and denied holding any grudges against Mr. Jones regarding Mr. Jones' relationship with his ex-wife. Detective Sullivan and Detective Baldwin were recalled to confirm that during their interview with Mr.

13

Billingsley, the details he provided were consistent with the investigation and independently provided by him.

Defense witness Tiesha Johnson, defendant Williams' girlfriend of nine years and the mother of his child, testified that she was with defendant Williams on the night of January 11, 2013. She stated that she picked him up from Mr. Jones' house between 9:00 and 10:00 p.m., and that they then went to her family's home on Clayton Drive and stayed there until the next morning. The next morning, around 8:00 a.m., she dropped defendant Williams off in Mayfair.

…

The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. The trier of fact's determination of the weight to be given evidence is not subject to appellate review. Thus, an appellate court will not reweigh the evidence to overturn a fact finder's determination of guilt.

Here, defendant Williams argues that he had no motive and that there was a reasonable hypothesis of innocence that he was not in Mr. Jones' vehicle, which was placed at the scene of the murder. However, the guilty verdict in this case indicates the jury rejected defendant Williams' hypothesis of innocence and concluded that, after being driven to Sorrento in Mr. Jones' vehicle, the victim was murdered by the codefendants. Based on our review of the record, we cannot say that the jury's determination was irrational under the facts and circumstances presented to them. We find that, based on the record, including trial testimony, phone records placing the cell phone used by defendant Williams that night in Sorrento at the time of the murder, and surveillance evidence and related testimony indicating that a passenger was in the backseat of Mr. Jones' vehicle, the jury could have reasonably rejected defendant Williams' hypothesis of innocence. An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the fact finder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. We are convinced that any rational trier of fact, viewing the evidence presented at trial in the light most favorable to the State, could have found the evidence proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that defendant Williams had the specific intent to kill the victim and participated in the commission of the murder….

[Case citations omitted.]

The Louisiana Supreme Court then denied relief without assigning additional reasons.[43]

---

[43] *State v. Williams*, 2016-1373 at p. 1; 219 So.3d at 336.

Section 2254 habeas relief "on a claim of insufficient evidence is appropriate only 'if it is found that upon the record evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt.' "[44] All credibility choices and conflicting inferences are to be resolved in favor of the verdict.[45] "A determination of a factual issue made by a state court shall be presumed correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."[46] Thus, under the standards of *Jackson* and § 2254, this Court's review on sufficiency of evidence claims is "twice-deferential."[47] The first layer of deference is to the jury's determinations at trial. "[O]n direct appeal, 'it is the responsibility of the jury – not the court – to decide what conclusions should be drawn from evidence admitted at trial.'"[48] A state-court decision rejecting a sufficiency challenge may not be overturned on federal habeas unless the decision was "objectively unreasonable."[49] "[A] federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court."[50]

In the present case, Petitioner asserts no evidence established any statement or act attributable to him from which the jury could infer specific intent and, thus, that the evidence did not establish he was a principal.[51] While the evidence presented was circumstantial evidence, the jury nevertheless concluded that Petitioner was guilty as a principal and committed the second-degree murder of Mr. Wilkins. The testimony of Mr. Billingsley supports the jury's implicit

---

[44] *West v. Johnson*, 92 F.3d 1385, 1393 (5th Cir. 1996) (quoting *Jackson*, 443 U.S. 307, 324 (1979)). Stated another way, "a reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 565 U.S. 1, 1, 132 S. Ct. 2, 4, 181 L.Ed.2d 311 (2011) (*per curiam*).

[45] *United States v. Cyprian*, 197 F.3d 736, 740 (5th Cir. 1999).

[46] 28 U.S.C. § 2254(e)(1).

[47] *Parker v. Matthews*, 567 U.S. 37, 43, 132 S.Ct. 2148, 2152, 183 LEd.2d 32 (2012).

[48] *See also Coleman v. Johnson*, 566 U.S. 650, 651, 132 S.Ct. 2060, 2062, 182 L.Ed.2d 978 (2012).

[49] *Id.*; *Parker*, 567 U.S. at 43.

[50] *Coleman*, 566 U.S. at 651.

[51] R. Doc. 1, pp. 4-5, R. Doc. 5-1, p. 33.

finding that Petitioner knowingly participated in the planning or execution of Mr. Wilkins' death. The surveillance video supports the jury's finding that the three people identified by Mr. Billingsley as being involved in the trip to Sorrento were in Mr. Jones's car shortly before Mr. Wilkins was shot. The testimony established that Petitioner had borrowed the cell phone in question on Friday, January 11; thus, this testimony also supports a conclusion that he was still in possession of the cell phone later that evening and in the early hours of February 12, when the crime occurred. The cell phone records supported a conclusion that Petitioner contacted Mr. Wilkins using McGee's borrowed cell phone for the specific intent of having Mr. Wilkins's return to Mr. Jones's house so that Mr. Wilkins would travel with Petitioner and Mr. Beals to Sorrento for the purpose of ending his life. The cell phone was used to call Wilkins while still in Baton Rouge and then was later used to call Mr. Jones from the Sorrento area, where the crime occurred. If the jury believed that the phone calls were made by Petitioner, then they also likewise concluded that he was in Sorrento when the calls from that area were placed. Further, if the jury believed Mr. Beals statement that he did not shoot the victim, the jury could have concluded that Petitioner was the one who inflicted the fatal gun shots.

In conclusion, for the reasons explained by the First Circuit, this Court cannot disregard the jury's verdict based on Petitioner's more favorable interpretation of the evidence. When the evidence in this case is viewed in the light most favorable to the prosecution, it simply cannot be said that the guilty verdict was irrational. The Court finds that the First Circuit's conclusion that the evidence was sufficient to support a conviction of second-degree murder was neither contrary to nor an unreasonable application of clearly established federal law. Accordingly, under the doubly deferential standards of review, which must be applied by this federal habeas court, relief is not warranted on this claim.

C.      **Right to Confrontation (Ground One)**

In his first assignment of error, Petitioner contends his right to confrontation was denied because statements made by a non-testifying co-defendant were allowed into evidence over his objection.[52] Specifically, he asserts his constitutional rights to confront and cross-examine witnesses were violated when Mr. Billingsley was allowed to testify that Beals told him that Williams went to Sorrento with Beals and Wilkins, and only two of them came back.[53] Citing *Ohio v. Roberts,[54]* the State asserts that although the law is settled that the Sixth Amendment Confrontation Clause provides the accused in a criminal proceeding the right to confront witnesses against him, an unavailable witness's out-of-court statement may be admitted so long as it has adequate indicia of reliability, i.e., the evidence must either fall within a "firmly rooted hearsay exception" or must bear "particularized guarantees of trustworthiness."[55] Here, the State posits the statements made by Beals to Mr. Billingsley were self-inculpatory and patently against his interest, and that such statements were properly admitted during Petitioner's trial pursuant to La. C.E. art. 804(B)(3).[56]

In his reply, Petitioner claims Mr. Billingsley's testimony was "internally inconsistent and lacked reliability."[57] Further Petitioner urged, "[A] non-testifying witness's out of court statement,

---

[52] R. Doc. 1, pp. 3-4, R. Doc. 5-1, p. 28, R. Doc. 11, pp. 4-5.

[53] R. Doc. 1, p. 3-4.

[54] 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (2004).

[55] R. Doc. 9, p. 10.

[56] R. Doc. 9, p. 11. Louisiana Code of Evidence article 804 provides, in pertinent part, as follows:

> **B. Hearsay exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> …
>
> **(3) Statement against interest.** A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

[57] R. Doc. 11, p. 1

including a co-defendant's confession, that facially incriminates a defendant violates the defendant's Six Amendment right to confrontation, even when the jury is instructed not to consider the prior statements against the defendant[,]" citing *Bruton v. United States*[58] and progeny.[59]

On direct appeal, Williams cited the Sixth Amendment of the United States Constitution and urged his "constitutional right to confront and cross examine witnesses against him had been violated by [the admission of] Mr. Billingsley's hearsay testimony regarding statements made by codefendant Beals, who did not testify."[60] The First Circuit noted that during trial, Williams' defense attorneys did not object on appeal to Mr. Billingsley's testimony on this ground, but instead had only objected to the admission of "any hearsay within hearsay, statements made by [Jones] or defendant Williams to [Beals] and subsequently conveyed to Mr. Billingsley."[61] Nevertheless, in the interest of justice, the First Circuit addressed Williams' argument, concluding the evidence was properly admitted in compliance with Louisiana's rules of evidence, reasoning in part, as follows:

> Louisiana Revised Statute 15:273 provides: "The accused shall have the right to be confronted with the witnesses against him and the depositions of witnesses shall not be evidence either for or against him except as provided by law." Hearsay is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. [La. C.E. art. 801(C).] One of the primary justifications for the exclusion of hearsay is that the adversary has no opportunity to cross examine the absent declarant to test the accuracy and completeness of the testimony. The Louisiana Supreme Court recognized an exception to the hearsay rule for statements made against the declarant's own penal interest in *State v Gilmore*, 332 So.2d 789, 792 (La. 1976). As codified in [La. C.E. art. 804(B)(3)], the exception includes a statement which was, at the time of its making, so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his

---

[58] 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).
[59] R. Doc. 11, p. 2.
[60] *State v. Williams*, 2015-0509 at p. 10. Petitioner and the State both recognized in their briefs to this Court that Beals was unavailable to testify after invoking his Fifth Amendment privilege against self-incrimination. See Doc. 5-1, p. 29; Doc. 9, p. 11.
[61] *State v. Williams*, 2015-0509 at p. 11.

position would not have made the statement unless he believed it to be true. Third party testimony concerning such statements is allowed when the declarant himself is unavailable to testify. A declarant is "unavailable as a witness" when the declarant cannot or will not appear in court and testify to the substance of his statement made outside of court. [La. C.E. art. 804(A).]

For such statements to be admissible, however, there must be indications that the statements are truly reliable….

… As detailed below, we find that Mr. Billingsley['s] testimony was admitted in compliance with our rules of evidence.

…

… Here, the testimony at issue involved statements by a codefendant, [Beals], that were clearly self-inculpatory. According to Mr. Billingsley's trial testimony, [Beals], in describing the murder of the victim in detail, told Mr. Billingsley that after repeated incidents of theft by the victim, "they" went out to Sorrento and the victim was "taken care of" when he stepped out of the vehicle to urinate. Mr. Billingsley's testimony was highly reliable since the statements divulged corroborated facts and details of the offense that the witness, Mr. Billingsley, would not have personal knowledge or the ability to provide absent the disclosure by the declarant, [Beals]. Finally, Mr. Beals was unavailable, pursuant to [La. C.E. art. 804(A)(1)], because he invoked his Fifth Amendment privilege against self-incrimination and refused to testify. …[T]he statements made by [Beals] were statements against his interest and he was unavailable to testify; thus [Beals] statements to Mr. Billingsley were admissible under [La. C.E. art. 804(B)(3)] as statements against interest. Thus, [this] assignment of error … lacks merit.

[Some case citations omitted].[62]

Thus, while the First Circuit resolved Petitioner's challenge to the admissibility of Mr. Billingsley's testimony by finding his testimony was admissible under a state law hearsay exception, it did not address the federal Confrontation Clause issue, which must now be addressed. The Sixth Amendment of the United States Constitution, made applicable to the States via the Fourteenth Amendment, provides, in relevant part, "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him…."[63] Thus, the Sixth

---

[62] *State v. Williams*, 2015-0509 at pp. 11-12.
[63] *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314.

Amendment guarantees a defendant's right to confront witnesses who "bear testimony" against him.[64] This right ensures reliability of the evidence by requiring statements under oath, submission to cross-examination, and the opportunity for the jury to assess witness credibility.[65] The Confrontation Clause prohibits (1) testimonial out-of-court statements; (2) made by a person who does not appear at trial; (3) received against the accused; (4) to establish the truth of the matter asserted; (5) unless the declarant is unavailable, and the defendant had a prior opportunity to cross-examine him."[66]

In *Bruton*,[67] cited by Petitioner, the Supreme Court held that a defendant is deprived of his rights under the Confrontation Clause when his non-testifying codefendant's confession naming him as a participant in the crime is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant.[68] *Bruton's* objective is to protect a criminal defendant's Sixth Amendment right to confront and cross-examine the witnesses against him.[69] However, "[o]nly [testimonial statements] cause the declarant to be a 'witness' within the meaning of the Confrontation Clause."[70]

In *Crawford*, the petitioner stabbed a man, who had allegedly tried to rape his wife. Petitioner claimed the stabbing was in self defense.[71] At trial, the State played for the jury the wife's tape-recorded statement, which was made during a police interrogation; the State introduced

---

[64] *Crawford v. Washington*, 541 U.S. 36, 51, 124 S.Ct. 1354, 1364, 158 L.Ed.2d 177 (2004).

[65] *California v. Green*, 399 U.S. 149, 158, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). A witness' testimony against a defendant is thus inadmissible unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination. *Melendez-Diaz*, 557 U.S. 305, 309, 129 S.Ct. 2527, 2531, 174 L.Ed.2d 314 (2009) (citing *Crawford*, 541 U.S. at 54, 124 S.Ct. 1354).

[66] *United States v. Jackson*, 636 F.3d 687 (5th Cir. 2011).

[67] *Bruton v. United States*, 391 U.S. at 137, 88 S.Ct. at 1628.

[68] In *Bruton*, an oral confession by a codefendant that the two defendants had committed the armed robbery was made to a postal inspector, who was investigating the armed postal robbery charge. *Bruton*, 391 U.S. at 124, 88 S.Ct. 1620, 1621.

[69] *See Crawford,* 541 U.S. at 50, 124 S.Ct. at 1363.

[70] *Davis v. Washington*, 547 U.S. 813, 821, 126 S.Ct. 2266, 2273, 165 L.Ed.2d 224 (2006); *Crawford*, 541 U.S. at 68-69, 124 S.Ct. at 1374.

[71] *Crawford*, 541 U.S. at 40, 1124 S.Ct at 1357.

the statement as evidence that the stabbing was not in self-defense.[72] The petitioner had no opportunity for cross-examination at trial, because his wife did not testify based on a state marital privilege.[73] The Supreme Court held that the recorded statement made by petitioner's wife during a police interrogation was testimonial and the use of her statement violated the Confrontation Clause. The Supreme Court reasoned, as follows in pertinent part:[74]

> "[The Confrontation Clause] applies to "witnesses" against the accused – those who "bear testimony." 2 N. Webster, An American Dictionary of the English Language (1828). "Testimony," in turn, is typically "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact. [*Id*.] An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. The constitutional test, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement."

The Supreme Court found that the State's use of the testimonial statement violated the Confrontation Clause, concluding, "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation."[75]

Accordingly, to determine whether Beals' statements implicate the protections of the Confrontation Clause and *Bruton*, this Court must determine whether they are testimonial in nature.[76] In *Michigan v. Bryant*, the Supreme Court provided a framework to assist lower courts in determining whether a statement qualifies as testimonial.[77] The Court emphasized "the relevant inquiry is ... the purpose that reasonable participants would have had, as ascertained from the

---

[72] *Id*.
[73] *Id*.
[74]*Crawford*, 541 U.S. at 51, 124 S. Ct. at 1364.
[75] *Crawford*, 541 U.S. at 68-69; 124 S.Ct. at 1374.
[76] *See Crawford*, 541 U.S. at 51, 124 S.Ct. at 1364; *United States v. Rentfrow*, 23-60054, 2024 WL 707392, at *4-5 (5th Cir. 2/21/2024); *cert denied*, 23-7528, 2024 WL 3014597 (6/17/2024), ___ S.Ct. ___; *U.S. v. Vasquez*, 766 F.3d 373, 378-79 (5th Cir. 2014); and *United States v. Nunez*, No. CR 14-284, 2016 WL 3167657, at *3 (E.D. La. June 7, 2016).
[77] *See* 562 U.S. 344, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011).

individuals' statements and actions and the circumstances in which the encounter occurred."[78] Further, "the Supreme Court has adopted the 'primary purpose' test for determining whether a statement is testimonial in nature."[79] "To qualify as 'testimonial' under this standard, 'a statement must have a primary purpose of establishing or proving past events potentially relevant to later criminal prosecution.[80]

Here, Beals' conversation with Mr. Billingsley while both were incarcerated at the same facility was nontestimonial in nature. Beals made the statement during a casual conversation about what had transpired that lead to his imprisonment, during which he opined, according to Mr. Billingsley, that "the only evidence [the authorities] had against them was pictures of them at the gas station in Sorrento and cell phone signals out in … the area."[81] The conversation bears none of the indicia of a formal statement sufficient to render it testimonial. Beals' statement was not made under circumstances that would lead an objective witness to reasonably believe that the statement would be available for use at a later trial.[82] Further Beals recapping the events of the evening to Mr. Billingsley while they were both in prison does not qualify as a testimonial statement under the primary purpose test; Beals's statement to Mr. Billingsley in prison was not "taken for use at trial."[83] Even the Supreme Court has classified "statements from one prisoner to another" as "clearly nontestimonial."[84] Because the statements at issue are nontestimonial, we reject Petitioner's Confrontation Clause argument. "[A] statement that is not testimonial cannot

---

[78] *Id.* at p. 360, 131 S.Ct. at 1156.
[79] *United States v. Noria*, 945 F.3d 847, 851 (5th Cir. 2019).
[80] *Id*. at 851-52 (quoting *Bullcoming v. New Mexico*, 564 U.S. 647, 659 n.6, 131 S.Ct. 2705, 2714 n. 6, 180 L.Ed. 610 (2011)).
[81] R. Doc. 5-6, p. 224.
[82] *See Crawford,* 541 U.S. at 52, 124 S.Ct. at 1364.
[83] *Bryant*, 562 U.S. at 358; 131 S.Ct. at 1155.
[84] *Davis*, 547 U.S. at 825; 126 S.Ct. at 2275.

violate the Confrontation Clause."[85] For these reasons, the state courts' denial of relief was neither contrary to nor an unreasonable application of Supreme Court precedent. Petitioner is not entitled to relief on this issue.

### D.    Ineffective Assistance of Counsel (Ground Three)

In this ground of his habeas petition, Petitioner asserts he was denied effective assistance of counsel in violation of the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution. Specifically, he urges his counsel was ineffective when he failed to: 1) recognize the appropriate objection to raise during trial, thereby denying Petitioner's right to be confronted with the witnesses against him; and 2) seek instruction that the mere presence at the scene of a crime did not permit an inference of guilt.[86]

In Petitioner's state court post-conviction relief proceedings, he urged that, because trial counsel failed to properly object based on his constitutional right of confrontation, Petitioner was not able to cross-examine Beals regarding his purported statements to Billingsley.[87] Petitioner further urged that counsel's failure to raise the proper objection denied Petitioner the opportunity to request a mistrial.[88] In a supplemental motion to amend and supplement his memorandum regarding his post-conviction relief application, Petitioner additionally urged that counsel was ineffective when he failed to seek an instruction that the mere presence at the scene of a crime did not permit an inference of guilt.[89]

The 23rd JDC denied Petitioner's original application and his amended and supplemental application for post-conviction relief, reasoning that: 1) the First Circuit had correctly analyzed

---

[85] *Brown v. Epps,* 686 F.3d 281, 286 (5th Cir. 2012) (alteration in original) (citation omitted); *see also Davis,* 547 U.S. at 823-24, 126 S.Ct. 2266.
[86] R. Doc. 1, p. 6.
[87] R. Doc. 5-8, p. 15.
[88] R. Doc. 5-8, p. 16.
[89] R. Doc. 5-10, pp. 123, 142-144.

the admissibility of the hearsay testimony of Mr. Billingsley, and 2) because the jury instructions had sufficiently outlined the law of principals and circumstantial evidence, the 23rd JDC was not convinced that the limiting instruction would or could have been granted.[90] The First Circuit thereafter denied Petitioner's writ application that sought review of the 23rd JDC's denial of his application.[91] The First Circuit concluded, "The district court did not err by denying the application for postconviction relief....('[T]he fact that a particular strategy is unsuccessful does not establish ineffective assistance of counsel.')."[92] Petitioner's writ application to the Louisiana Supreme Court was likewise denied.[93] In a *per curiam* opinion, the Supreme Court reasoned, in pertinent part, "Applicant fails to show that he received ineffective assistance of counsel under the standard of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."[94]

Under *Strickland v. Washington*,[95] a habeas petitioner who claims that his counsel was ineffective must show the following: (1) that his counsel's performance was "deficient," i.e., that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment; and (2) that the deficient performance prejudiced his defense, i.e., that counsel's errors were so serious as to deprive the defendant of a fair trial in which the result is reliable.[96] The petitioner must make both showings to obtain habeas relief based on alleged ineffective assistance of counsel.[97]

To satisfy the deficiency prong of the *Strickland* standard, the petitioner must demonstrate that his counsel's representation fell below an objective standard of reasonableness as measured

---

[90] See Order, R. Doc. 5-8, p. 156, and Reasons for Judgment, R. Doc. 5-8, p. 152-154.
[91] R. Doc. 5-8, p. 186; *State v. Williams*, 2021-0107 at p. 1, 2021 WL 961671 at p. 1.
[92] *Id.*
[93] R. Doc. 5-8, p. 191.
[94] R. Doc. 5-8, p. 192.
[95] 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
[96] *Id.*, 466 U.S. at 687, 104 S.Ct. at 2064.
[97] *Id.*

by prevailing professional standards.[98] Great deference is given to counsel, "strongly presuming that counsel has exercised reasonable professional judgment."[99] Even if the petitioner satisfies the first prong of the *Strickland* test, his petition must further demonstrate prejudice resulting from the alleged errors.[100] The petitioner must show a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.[101] A habeas petitioner must "affirmatively prove," not just allege prejudice.[102] Both the *Strickland* standard for ineffective assistance of counsel and the standard for federal habeas review of state court decisions under 28 U.S.C. § 2254(d)(1) are highly deferential, and when the two apply together, the review by federal courts is "doubly deferential."[103] !

The above required showing is one that Petitioner cannot make in the instant case. Petitioner's ineffective assistance of counsel claim was considered and rejected by the state courts during his post-conviction relief proceedings. As noted above, Petitioner's right to confrontation claim lacks merit; the testimony of Mr. Billingsley that Petitioner urges his counsel should have challenged as violative of his constitutional right referenced statements that were nontestimonial and, thus, not protected by the Confrontation Clause. Counsel's performance cannot be considered deficient or prejudicial on the basis of failing to raise a meritless argument. And the result of the proceeding would not have been different had counsel raised the issue.[104] !!

Likewise, we find no merit in Petitioner's contention that counsel was ineffective in failing to seek an instruction that his mere presence at the crime scene did not permit an inference of guilt.

---

[98] *Martin v. McCotter*, 796 F.2d 813, 816 (5th Cir. 1986).

[99] *Id*., citing *Lockhart v. McCotter*, 782 F.2d 1275, 1279 (5th Cir. 1986).

[100] *Earvin v. Lynaugh*, 860 F.2d 623, 627 (5th Cir. 1988); *Hebert*, No. 20-616, 2023 WL 6396078, at *11.

[101] *Martin*, 796 F.2d at 816 (citing *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068.)

[102] *Day v. Quarterman*, 566 F.3d 527, 536 (5th Cir. 2009).

[103] *Harrington v. Richter*, 562 U.S. 86, 105, 131 S.Ct. 770, 788, 178 L.Ed.2d 624 (2011).

[104] *Turner v. Quarterman*, 481 F.3d 292, 298 (5th Cir. 2007); *Parr v. Quarterman*, 472 F.3d 245, 256 (5th Cir. 2006).

"Improper jury instructions in state criminal trials do not generally form the basis for federal habeas relief."[105] Instead, "the error must be so egregious as to rise to the level of a constitutional violation or so prejudicial as to render the trial itself fundamentally unfair."[106]

Here, the trial court instructed the jury regarding the law of principals.[107] And the jury implicitly determined that Petitioner was a principal who participated in the commission of the murder. On direct appeal, the First Circuit found:

> We are convinced that any rational trier of fact, viewing the evidence presented at trial in the light most favorable to the State, could have found the evidence proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that defendant Williams had the specific intent to kill the victim and participated in the commission of the murder.

*State v. Williams*, 2015-0509 at p. 10.

Thereafter, the Louisiana Supreme Court denied Petitioner's writ applications. Pursuant to the last writ application, wherein Petitioner sought post-conviction relief, the Court expressly found that Petitioner had failed to show he received ineffective assistance of counsel under the *Strickland* standard.

Petitioner has not established that counsel's failure to request the specific instruction here resulted in any prejudice to his defense. The failure to request the specific charge at issue did not "infuse the trial with unfairness as to deny due process of law."[108] As such, the Louisiana Supreme

---

[105] *Tarpley v. Estelle*, 703 F.2d 157, 159 (5th Cir. 1983).

[106] *Baldwin v. Blackburn*, 653 F.2d 942, 951 (5th Cir. 1981) (quoting *Bryan v. Wainwright*, 588 F.2d 1108, 1110-11 (5th Cir. 1979)).

[107] The trial judge instructed the jury as follows pertaining to principals:
> All persons knowingly concerned in the commission of a crime are principals and are guilty of the crime charged if, whether present or absent, they directly commit the act constituting the crime, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime. R. Doc. 5-7, p. 171.

[108] *Estelle v. McGuire*, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991), quoting *Liseba v. California*, 314 U.S. 219, 228, 62 S.Ct. 280, 286, 86 L.Ed. 166 (1941).

Court's decision that Petitioner had not established that his counsel was ineffective was neither contrary to, nor an unreasonable application of federal law. Petitioner has thus failed to demonstrate any fundamental unfairness to the proceeding, the underlying theme of the two-prong *Strickland* approach.[109] Accordingly, his claim of ineffective assistance of appellate counsel provides no basis for habeas relief. !

## IV.    CERTIFICATE OF APPEALABILITY

Should Petitioner seek to appeal, a certificate of appealability should be denied. An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability."[110] Although Petitioner has not yet filed a Notice of Appeal, the Court may address whether he would be entitled to a certificate of appealability.[111] A certificate of appealability may issue only if a habeas petitioner has made a substantial showing of the denial of a constitutional right.[112] In cases where the Court has rejected a petitioner's constitutional claims on procedural grounds, a petitioner must demonstrate that "jurists of reason would find it debatable whether the petition states a valid claim of a denial of constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."[113] In cases where the Court has rejected a petitioner's constitutional claims on substantive grounds, a petitioner must demonstrate that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."[114] Here, reasonable jurists would not debate the denial of Petitioner's habeas application or the correctness

---

[109] *Earvin, 860 F.2d* at 627 (citing *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069)

[110] 28 U.S.C. § 2253(c)(1)(A).

[111] *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).

[112] 28 U.S.C. § 2253(c)(2).

[113] *Ruiz v. Quarterman*, 460 F.3d 638, 642 (5th Cir. 2006).

[114] *Pippin v. Dretke*, 434 F.3d 782, 787 (5th Cir. 2005), quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

of the procedural or substantive rulings. Accordingly, if Petitioner seeks to pursue an appeal in this case, a certificate of appealability should be denied.

V.    **RECOMMENDATION**

**IT IS RECOMMENDED** that the Petition for Writ of Habeas Corpus by a Person in State Custody, filed by Petitioner Calvin K. Williams be **DENIED** and that this proceeding be **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER RECOMMENDED** that, if Petitioner seeks to pursue an appeal in this case, a certificate of appealability be denied.

Signed in Baton Rouge, Louisiana, on September 30, 2024.


_____
**SCOTT D. JOHNSON**
**UNITED STATES MAGISTRATE JUDGE**